**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Jaslyn Cosey,<br><br>Plaintiff<br>v.<br><br>Russell Road TIC LLC d/b/a Glo Las Vegas; TIC Manager LLC; GREP Southwest, LLC, d/b/a/ Greystar,<br><br>Defendants | Case No.: 2:25-cv-02069-JAD-EJY<br><br>**Order Denying Motion to Compel Arbitration and Granting in Part and Denying in Part Motion to Dismiss**<br><br>[ECF Nos. 24, 32] |

Jaslyn Cosey was a tenant at Glo Las Vegas, an apartment complex in Las Vegas, Nevada. Cosey receives disability payments, and when the timing of her payments changed, she fell behind on her rent. Cosey accumulated late fees and lease-violation fees that she contends were not disclosed to her in the process of applying for her apartment and signing her lease. So she sues Glo Las Vegas, its landlord TIC Manager, and its property-management company Greystar under Nevada's Deceptive Trade Practices and consumer-fraud statutes on behalf of herself and a putative class of tenants.[1] The defendants argue that they, as nonsignatories, can compel Cosey to arbitrate her claims under her online leasing platform and residential portal agreements. The defendants also move to dismiss Cosey's complaint for inadequacy under Federal Rules of Civil Procedure (FRCP) 9(b) and 12(b)(6)[2] and argue that she lacks Article III standing to seek injunctive relief.[3] Because the defendants have not shown that Cosey's claims rely on the terms of the written agreements containing the arbitration provisions or arise out of

[1] Though the complaint is styled as a class action, no class has been certified.

[2] ECF No. 24 at 10.

[3] *Id.* at 12.

and relate directly to the agreements, I deny the motion to compel arbitration. As to the motion to dismiss, I find that Cosey has standing to seek injunctive relief and has plausibly stated the portion of her NDTPA claim arising from the alleged violation of a Nevada statute that prohibits landlords from collecting attorney's fees without a court order. But Cosey's other theories are either belied by the documents she relies on or too thin to be plausible. So this case proceeds only on Cosey's theory that the defendants violated the NDTPA by charging her attorney's fees without a court order authorizing them.

## Background

### A. Cosey alleges that Greystar employees omitted information about utility charges and late fees when she applied to live at Glo Las Vegas.

Jaslyn Cosey applied to rent a unit that Glo Las Vegas advertised at $1,598 a month, excluding fees.[4] Cosey alleges that she spoke to a community property manager and a leasing agent before she applied and that she was not told during those conversations that she would be charged attorneys' fees in the event of late rental payments or that the property-management company would not "make accommodations to [her] rent payment schedule to account for the timing of her disability payments."[5] Cosey also alleges that neither the community property manager nor the leasing agent specified how much she would be charged for water, sewer, and trash each month, or how those amounts would be calculated.[6]

[4] ECF No. 22 at 7.

[5] *Id.*

[6] *Id.*

**B. Cosey accrued late and lease-violation fees after the timing of her disability payments changed.**

Shortly after moving into her Glo apartment unit, Cosey transitioned from short-term to long-term disability payments, and her payment schedule shifted.[7] As a result, there were several months in which her disability payments were delayed, and she was unable to make her rent payments on time.[8] Cosey's long-term disability payments then shifted to the middle of the month, which made it difficult to pay rent on the first of the month.[9] Cosey alleges that she met with the Glo Las Vegas community property manager, but the employee was unwilling to modify her rent-payment schedule.[10] Cosey also alleges that for each rent payment that came in after the first of the month, the defendants charged her a late fee and an additional $75 fee that was listed in her ledger as an "Attorney or Legal" fee.[11] When she attempted to pay her "contractually specified rent and utilities," Cosey states that the defendants routinely refused to accept the payments because they were not for the full balance of her account.[12]

Cosey then applied to the Clark County Cares Housing Assistance Program ("CHAP") and was approved for $10,727.84 in rental-assistance funds that the program issued directly to the defendants.[13] The defendants, Cosey alleges, "misused" her CHAP funds because they applied the funds to pay down the accumulated balance of her account, which included lease-

---

[7] *Id.* at 11.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 9.

[12] *Id.* at 12.

[13] *Id.*

violation and high utility fees, and they took the position that the remaining funds were insufficient to cover her rent that month.[14] After Glo Las Vegas issued Cosey a 30-day eviction notice, she met with the community property manager, who said that it was standard practice for Greystar, the property-management company, to charge its tenants attorney's fees.[15]

**C. Cosey sues under several provisions of the Nevada Deceptive Trade Practices Act.**

Cosey's complaint contains two claims for relief, framed as violations of Nevada's Deceptive Trade Practices Act and consumer fraud.[16] While it purports to separate out these claims, both are reliant on the alleged violations of the NDTPA because Nevada's consumer-fraud statute, Nevada Revised Statutes (NRS) 41.600, is merely enabling language that authorizes "any person who is a victim of" violations of the NDTPA to bring a lawsuit for damages and equitable relief.[17]

Cosey offers several theories of NDTPA liability. She first theorizes that the defendants violated NRS 598.092(8) and NRS 598.0923(1)(c) by charging her attorney's fees for late payments without a court order, which violates NRS 118A.220(1)(c).[18] She further alleges that by not telling her how her utilities would be calculated, the community property manager Leslie Perez and leasing consultant Jimmitrice Winters knowingly made false statements and failed to disclose material facts concerning the true price of renting a unit at Glo Las Vegas in violation of NRS 598.0915(13), (15), and NRS 598.0923(1)(b).[19] Cosey's third theory is that the defendants

---

[14] *Id.* at 13.

[15] *Id.* at 12.

[16] *Id.* at 19, 22.

[17] *See* Nev. Rev. Stat. § 41.600.

[18] ECF No. 22 at 20.

[19] *Id.*

used "intimidation and unconscionable practices" in violation of NRS 598.0923(1)(d)–(e) by illegally charging her attorney's fees, "daring [her] to challenge their illegal practice in court," and failing to accommodate "reasonable requests for accommodation of [her] disabilities."[20] Her final theory is that the defendants knowingly misrepresented the "actual landlord" of Glo Las Vegas and "conducted business in Nevada through [d]efendant TIC Manager, an entity that does not possess all required state and county licenses to operate as a landlord," in violation of NRS 598.0915(15).[21]

**D. Glo and Greystar move to compel arbitration based on written agreements that Cosey signed with RealPage and ActiveBuilding.**

The defendants use OneSite, an online software system provided by RealPage, Inc., to process prospective tenants' lease applications.[22] The parties acknowledge that Cosey used OneSite to apply for her apartment and electronically agreed to RealPage's Online Leasing Arbitration Agreement and Class Action Waiver.[23] Cosey also created an account with Glo Las Vegas's ActiveBuilding resident portal.[24] In doing so, she accepted the ActiveBuilding Resident Portal Terms of Service, which included an arbitration clause.[25]

The defendants argue that the RealPage agreement "is not untethered to the Property-side participants" and that it covers Cosey's claims related to the application fee, pre-lease

---

[20] *Id.*

[21] *Id.*

[22] ECF No. 32 at 6.

[23] *Id.*

[24] *Id.* at 7.

[25] *Id.* at 7–8.

disclosures, and application-stage conduct "arising from that same transaction."[26] The defendants also contend that the ActiveBuilding arbitration agreement applies here "to the extent [that Cosey's] claims arise out of or relate to the Service and the apartment community manager's handling of tenant billing, services, and related account activity" because it applies to disputes between the user, provider, and the apartment-community manager.[27] Cosey responds that her claims are not related to the RealPage or ActiveBuilding agreements and that the defendants as nonsignatories are therefore unable to compel arbitration under a theory of equitable estoppel.[28]

## Discussion

### A. The motion to compel arbitration is denied.

#### *1. The defendants cannot compel arbitration because Cosey's claims do not arise out of or directly relate to the written agreement.*

"Generally, parties who have not assented to an arbitration agreement cannot be compelled to arbitrate under its terms."[29] But the United States Supreme Court has held that "a litigant who is not a party to an arbitration agreement may invoke arbitration under the Federal Arbitration Act if the relevant state contract law allows the litigant to enforce the agreement."[30] Nevada contract law thus determines whether the defendants as nonsignatories can compel arbitration.

In *Truck Insurance Exchange v. Palmer J. Swanson, Inc.*, the Nevada Supreme Court articulated five theories under which a nonsignatory to an agreement may be compelled to

---

[26] *Id.* at 10–11.

[27] *Id.* at 9, 11.

[28] ECF No. 36 at 7–8.

[29] *Namisnak v. Uber Tech.*, 971 F.3d 1088, 1094 (9th Cir. 2020).

[30] *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 632 (2009)).

arbitrate: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel."[31] The Nevada Supreme Court then held in in *RUAG Ammotec GmbH v. Archon Firearms, Inc.* that "those same five theories should be used to determine when a nonsignatory has a right to enforce an arbitration agreement."[32] The court also explained that a nonsignatory seeking to compel arbitration based on a theory of estoppel can do so under two circumstances: if the claims rely on or arise out of and directly relate to the written agreement or they allege misconduct by the nonsignatory and one or more signatories.[33] The defendants argue that the first circumstance is applicable in this case because the RealPage agreement covers claims related to Cosey's housing application at Glo Las Vegas, RealPage's services to Glo Las Vegas, and tenant-screening reports prepared, reviewed, or used in connection with her application.[34] And defendants contend that several of Cosey's claims are related to the application fee, pre-lease disclosures, and "application-stage conduct arising from that same transaction."[35]

In *RUAG*, the Nevada Supreme Court adopted the test outlined by the Eleventh Circuit in *MS Dealer Service Corp. v. Franklin*.[36] This test states that "[w]hen each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written] agreement,' and

[31] *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 660 (Nev. 2008) (cleaned up).

[32] *RUAG Ammotec GmbH v. Archon Firearms, Inc.*, 538 P.3d 428, 434 (Nev. 2023).

[33] *Id.* at 435 (citing *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005)).

[34] ECF No. 32 at 10–11.

[35] *Id.* at 11.

[36] *RUAG*, 538 P.3d at 435.

arbitration is appropriate."[37] The plaintiff in *MS Dealer* signed a "Buyers Order" with a car dealership in which she was charged $990 for a service contract through MS Dealer.[38] The Buyers Order contained an arbitration clause, and MS Dealer was not a signatory to it.[39] When the plaintiff discovered problems with the car, she sued MS Dealer for breach of contract, breach of warranty, fraud, and conspiracy, and MS Dealer moved to compel arbitration based on the Buyers Order.[40] The Eleventh Circuit explained that the plaintiff's claims against MS Dealer made reference to and presumed the existence of the $990 charge and that each of her claims depended "entirely upon her contractual obligation to pay the service contract."[41] So it held that the plaintiff was equitably estopped from avoiding arbitration with MS Dealer.[42]

Unlike the complaint in *MS Dealer*, Cosey does not reference the RealPage or ActiveBuilding agreements in her complaint. In fact, her claims are not based on a contract at all—they are statutory claims under Nevada's Deceptive Trade Practices Act. She alleges that she corresponded and interacted with a community property manager and a leasing consultant during her tour of the property, but the defendants do not argue that this correspondence occurred through RealPage. Cosey also alleges that she raised concerns with Glo Las Vegas employees about how the schedule of her disability payments would impact her ability to pay rent by the first of the month, but the defendants do not suggest that her correspondence occurred through the ActiveBuilding portal. The defendants argue that the RealPage agreement governs Cosey's

---

[37] *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993)).

[38] *Id.* at 944.

[39] *Id.*

[40] *Id.* at 944–45.

[41] *Id.* at 947–48.

[42] *Id.* at 948.

claims about the application fee, but Cosey does not allege that charging an application fee violates Nevada law.[43] Because Cosey's allegations are unrelated to RealPage or ActiveBuilding, under *MS Dealer* and *RUAG*, she cannot be compelled to arbitrate with the defendants based on her written agreements with those websites.

#### ***2. The cases defendants rely on are distinguishable from the facts of this case and are not dispositive.***

The defendants rely on a handful of cases, including two Ninth Circuit cases in which the court allowed nonsignatories to compel arbitration agreements against a signatory.[44] In *Franklin v. Community Regional Medical Center*, a nurse sued the hospital she worked at under the Fair Labor Standards Act and provisions of California law.[45] The hospital sought to compel arbitration based on a clause in the agreement that the plaintiff signed with the staffing agency that assigned her to the hospital.[46] The district court held that the nonsignatory hospital could enforce the arbitration agreement.[47] It reasoned that Franklin's employment with the staffing agency was "central to her claims" because the staffing agency was responsible for seeking meal-period waivers, compensating Franklin for missed meal breaks, making Franklin available for an orientation that she alleged was "off-the-clock work," reviewing timekeeping records, and raising discrepancies with the hospital.[48] The Ninth Circuit affirmed, finding that the plaintiff's claims against the hospital were "intimately founded in and intertwined with" her employment

[43] ECF No. 22 at 8.

[44] ECF No. 32 at 11.

[45] *Franklin v. Cmty. Reg'l Med. Cntr.*, 998 F.3d 867, 870 (9th Cir. 2021).

[46] *Id.*

[47] *Id.*

[48] *Id.* at 875.

contract with the staffing agency.[49] The "substance of [Franklin's] claims [was] rooted in her employment relationship with [the staffing agency]," the panel reasoned.[50]

Unlike Franklin's claims against the hospital, Cosey's claims are not intertwined with the arbitration-clause-containing agreements she inked. Her relationships with the RealPage and ActiveBuilding websites do not govern her relationship with her apartment complex and its management; the agreements instead govern her relationship with the online leasing software and the resident portal. The substance of her claims is not rooted in her relationship with RealPage or ActiveBuilding because they are statutory claims about the defendants' conduct unrelated to the services that RealPage and ActiveBuilding provide.

The defendants also rely on *Herrera v. Cathay Pacific Airways Limited*, in which the Ninth Circuit reversed the district court's denial of a motion to compel arbitration.[51] The Herreras booked flights through a third-party booking website whose terms and conditions stated that, in the event of a cancellation, the website would process refund requests in exchange for a fee.[52] Those terms and conditions also contained an arbitration clause.[53] When the Herreras sought a refund for their cancelled flight, the third-party booking website told them that Cathay Pacific Airways would only provide travel vouchers, which did not align with the airline's General Conditions of Carriage.[54] So the Herreras sued the airline for breach of contract, and the airline moved to compel arbitration, relying on the arbitration clause in the third-party booking

---

[49] *Id.* at 871 (citing *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal.App.4th 1705 (2003)).

[50] *Id.*

[51] *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702 (9th Cir. 2024).

[52] *Id.* at 705.

[53] *Id.*

[54] *Id.*

website's terms and conditions.[55] The Ninth Circuit concluded that the Herreras' allegations against Cathay Pacific Airways were intimately founded upon and intertwined with the third-party booking website's alleged conduct under its own terms and conditions, so the Herreras were estopped from denying the nonsignatory airline's right to enforce the arbitration clause.[56]

The facts in *Herrera* and *Franklin* are materially distinguishable from the facts of this case. In *Herrera*, the court acknowledged that this inquiry must focus on "how the obligations interact as a whole" and whether the plaintiff's claims implicate the signatory's responsibilities under its contract.[57] Cosey alleges that community property managers at Glo Las Vegas failed to tell her how her utility charges would be calculated and about the lease-violation fees. The defendants argue that because her conversations with the community property manager and the leasing agent happened at the "application stage," they are governed by the RealPage agreement. This argument fails because the defendants' alleged conduct did not occur through RealPage's platform. In *Herrera*, the conflict between the Herreras and Cathay Pacific Airways was inextricably linked to the website of the third-party booking agent that was a signatory to the arbitration agreement because the website acted as a middleman. But the conflict between Cosey and the defendants is completely unrelated to RealPage and ActiveBuilding as Cosey alleges that the subject acts and omissions arose from meetings and conversations that took place outside of these portals.

*RUAG* instructs that to compel arbitration, the defendants must show that Cosey's claims arise out of and directly relate to the written agreements with RealPage and ActiveBuilding.[58]

---

[55] *Id.*

[56] *Id.* at 708.

[57] *Id.* at 709.

[58] *RUAG*, 538 P.3d at 434.

But Cosey is not seeking to hold the defendants liable for obligations imposed by the RealPage or ActiveBuilding agreements; her complaint does not mention these agreements and does not presume their existence, and the defendants have failed to link her allegations to the written agreements beyond general statements that the conduct at issue occurred during a time period governed by the agreements. I thus deny defendants' motion to compel arbitration.

### B. The motion to dismiss is granted in part and denied in part.

#### *1. Cosey has sufficiently pled just one portion of her NDTPA claim.*

The defendants move to dismiss all of Cosey's claims for insufficiency. They argue that the claims sound in fraud so she must plead them with the particularity required by Rule 9(b).[59] They contend that Cosey's claims "attribute[] undifferentiated 'deceptive' conduct to multiple separate entities without specifying which defendants made which statement, when and where it was made, or why it was false."[60] The defendants argue that Cosey also fails to state a claim under Rule 12(b)(6). They assert that her intimidation and unconscionable-practices theories fail because she does not allege facts that "fit[] the statutory terms rather than a routine landlord-tenant payment dispute."[61] The defendants also argue that Cosey's theory about her utility charges fails because her leases included utility addenda that identify the methods used to calculate utility costs.[62] They contend that because her leases identify the lease-violation notice fees and characterize late charges as liquidated damages and not as attorney's fees and litigation costs, her theory about attorney's fees fails.[63] Finally, the defendants argue that Cosey's theory

---

[59] ECF No. 24 at 10.

[60] *Id.*

[61] ECF No. 28 at 7.

[62] *Id.* at 5.

[63] ECF No. 24 at 11.

about the identity and licensure of the landlord of the building fails because she only offers conclusory allegations and does not explain what licenses TIC Manager lacked, which statutes require it, and how this situation caused her to pay the charges she is challenging.[64]

***a. Because Cosey's claims sound in fraud, they must satisfy the heightened pleading standard in FRCP 9(b).***

The parties disagree about which pleading standard applies to Cosey's claims. Cosey argues that "NDTPA claims are subject to ordinary pleading standards and not the heightened standards of Rule 9."[65] The defendants that the position that her claims must be pled with the particularity required by Rule 9(b) because they sound in fraud.[66] FRCP 9(b) requires a "party [to] state with particularity the circumstances constituting fraud or mistake" in an action "alleging fraud or mistake."[67] Meeting that level of specificity generally requires pleading "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations" and "what is false or misleading about the purportedly fraudulent statement, and why it is false."[68] In other words, "Rule 9(b) requires a party to state . . . the who, what, when, where, and how of" the alleged fraud.[69] "[M]ere conclusory allegations of fraud are insufficient."[70]

---

[64] ECF No. 28 at 6.

[65] ECF No. 27 at 4 (cleaned up).

[66] ECF No. 24 at 10.

[67] Fed. R. Civ. P. 9(b).

[68] *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007), and *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)) (cleaned up).

[69] *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citing *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)) (cleaned up).

[70] *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

The Supreme Court of Nevada has held that Nevada Rule of Civil Procedure 9(b), which is identical to FRCP 9(b),[71] applies to NDTPA claims.[72] And the Ninth Circuit has held that the Rule 9(b) particularity requirement applies to state-law causes of action and claims "grounded in fraud" even if fraud is not a necessary element.[73] A claim is "grounded in fraud" if a plaintiff alleges "a unified course of fraudulent conduct and [relies] entirely on that course of conduct as the basis of that claim."[74] The unified course of fraudulent conduct alleged here is the series of misrepresentations and omissions about lease-violation notice fees, utility fees, and the identity of Cosey's landlord. This alleged unified course of fraudulent conduct constitutes the entire basis of Cosey's claims, so I find that all of her claims are "grounded in fraud" and subject to the 9(b) pleading standard.[75]

***b. Cosey has pled enough facts to support just one of her NDTPA theories.***

To state an NDTPA claim, a plaintiff must plead facts showing that the defendant engaged in one of the many deceptive trade practices enumerated in NRS 598.915–925. Cosey invokes four of those statutory practices. She theorizes that the defendants violated NRS 598.0923(1)(d)–(e) when they refused to change her payment schedule to accommodate her disability payment, charged her attorney's fees without a court order, and dared her to challenge

---

[71] *Compare* Nev. R. Civ. P. 9(b) *with* Fed. R. Civ. P. 9(b).

[72] *Davenport v. GMAC Mortg.*, 2013 WL 5437119, at *2 (Nev. Sept. 25, 2013) (noting that the state counterpart to Rule 9(b) applies to deceptive-practices claims) (unpublished); *Davenport v. Homecomings Fin., LLC*, 2014 WL 1318964, at *3 (Nev. March 31, 2014).

[73] *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

[74] *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir. 2009).

[75] Applying only the FRCP 12(b)(6) standard to these claims would not change my conclusions because the complaint fails to state these claims even under the less stringent FRCP 12(b)(6) standard..

this practice in court.[76] Cosey also theorizes that the defendants knowingly made false statements and failed to disclose material facts concerning the true price of renting a unit at Glo Las Vegas in violation of NRS 598.0915(13), (15), and NRS 598.0923(1)(b) because they misrepresented the price of water, trash, and sewer services.[77] She contends that the defendants violated NRS 598.0915(15) and NRS 598.0923(1)(a) by knowingly misrepresenting the actual landlord of Glo Las Vegas and conducting business through TIC Manager, which she alleges does not possess all required state and county licenses to act as a landlord.[78] And Cosey's fourth theory is that the defendants knowingly misrepresented her legal rights and violated a Nevada statute by charging her attorney's fees for late payment without a court order, in turn violating NRS 598.092(8).[79] The defendants counter that Cosey's leases contain the necessary information about the price of renting at Glo Las Vegas and that these documents "undermine any plausible allegation that the challenged charges were hidden or omitted in breach of a disclosure duty."[80]

#### ***i. Cosey has not adequately pled that the defendants acted unconscionably or intimidated her.***

NRS 598.0923(1)(d) makes it actionable to use coercion, duress or intimidation in a transaction, while subsection (e) identifies as a violation the use of an unconscionable practice in a transaction.[81] Cosey's first NDTPA theory is that the defendants violated NRS

---

[76] ECF No. 22 at 20.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] ECF No. 24 at 11.

[81] Nev. Rev. Stat. § 598.0923(1)(d)–(e).

598.0923(1)(d)–(e) when they charged her attorney's fees, "dar[ed] [her] to challenge their illegal practice in court," and "fail[ed] to accommodate reasonable requests for accommodation of [her] disabilities."[82] The defendants argue that Cosey here merely pled a routine landlord–tenant dispute, not unconscionable or intimidating practices.[83]

Cosey states particular facts about her conversations with employees, but she nevertheless fails to plead sufficient facts under Rule 9(b) to support her unconscionability and intimidation theories. The NTDPA defines an "unconscionable practice" as an act or practice that "[t]akes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[84] The facts that Cosey offers to satisfy this standard are that the defendants illegally charged her attorney's fees throughout her tenancy at Glo Las Vegas, that community property manager Michael De La Cruz confirmed that it is Greystar's regular practice to charge tenants attorney's fees so she'd have to challenge this practice in court, and that the defendants would not modify her rent-payment schedule to align with the schedule of her disability payments.

These facts fall far below the threshold for unconscionability under the statute because requiring a tenant to pay her rent at the time of the month she agreed to in her lease is not "grossly unfair" under these circumstances. These facts also do not establish intimidation. While the statute does not define intimidation, Black's Law Dictionary explains that it means "[u]nlawful coercion" or "extortion,"[85] and none of Cosey's allegations even come close to

---

[82] ECF No. 22 at 20.

[83] ECF No. 28 at 7.

[84] Nev. Rev. Stat. § 598.0923(2)(b)(1) (cleaned up).

[85] Intimidation, Black's Law Dictionary (12th ed. 2024).

unlawful coercion or extortion. I thus dismiss the portion of Cosey's NDTPA claim based on allegations of intimidation and unconscionable practices for failure to state such claims.

***ii. Cosey has not adequately pled that Greystar violated the NDTPA in relation to her utility payments.***

NRS 598.0915(13) states that it is a deceptive trade practice to make false or misleading statements of fact concerning the price of goods or services for sale or lease, while subsection (15) of that statute explains that knowingly making any other false representation in a transaction is also actionable.[86] NRS 598.0923(1)(b) states that people engage in a deceptive trade practice when they fail "to disclose a material fact in connection with the sale or lease of goods or services."[87] Cosey alleges that the defendants knowingly made false statements and failed to disclose material facts concerning the true price of renting a unit at Glo Las Vegas because they did not clearly explain how much utilities would cost or how they would be calculated.[88]

Although Cosey names specific employees whom she spoke with at Glo Las Vegas before she applied for the apartment and alleges that they failed to point out key information in her lease related to fees and the cost of utilities,[89] she fails to state a plausible claim. The crux of this portion of Cosey's NDTPA claim is that the property manager and the leasing agent did not explain how much her utilities would cost or how they would be calculated. She alleges that the utility addendum to her lease contains an "inscrutable" formula, and she excerpts a portion of

---

[86] Nev. Rev. Stat. §§ 598.0915(13), (15).

[87] *Id.* § 598.0923(1)(b).

[88] ECF No. 22 at 20.

[89] *Id.* at 7–8.

that addendum in her complaint.[90] She also alleges that her move-in statement similarly omitted information about how much her utilities would cost.[91]

The portion of the utility addendum in the complaint does not provide the full picture because it does not include the legend that explains what each formula means.[92] Cosey's excerpt of the addendum makes it seem like all she was told was that "formula six" would be used to calculate her water and sewer bills and that "formula ten" would be used to calculate her trash bill.[93] But page two of the utility addendum has a key that explains that formula six means "allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula," and formula ten means "allocation based on a lawful formula not listed here."[94] Another attachment to the addendum explains that formula ten means that the fee is equally divided among all units.[95] The move-in statement included in Cosey's complaint also states that the rent price does not include utility billing.[96] Cosey's theory that the Greystar employees failed to disclose key information about the "true price" of renting an apartment at Glo Las Vegas is facially disproven by the express terms of the documents on which this claim is founded. So I dismiss Cosey's NDTPA claim to the extent it is grounded in allegations regarding the utility payments.

---

[90] *Id.* at 9.

[91] *Id.* at 9–10.

[92] The full text of Cosey's leases may be considered at this motion-to-dismiss stage under the doctrine of incorporation by reference because her allegations in the complaint refer to and rely on the contents of her lease. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[93] ECF No. 22 at 9.

[94] ECF No. 24-2 at 14.

[95] *Id.* at 15.

[96] ECF No. 22 at 10.

***iii. Cosey's NDTPA claim based on alleged misrepresentations about the true landlord of Glo Las Vegas is inadequately pled.***

NRS 598.0915(15) and NRS 598.0923(1)(a) state that it is a deceptive trade practice to conduct business without all required state, county, or city licenses.[97] Cosey alleges that the defendants violated these provisions of the NDTPA when they knowingly misrepresented the actual landlord of Glo Las Vegas and conducted business in Nevada through defendant TIC Manager, an entity that she alleges does not possess all required state and county licenses to operate as a landlord.[98] The defendants argue that Cosey does not specify what licenses TIC Manager lacked, what law required them, or how this lack of licensure caused the damages she alleges.[99]

Cosey does not adequately plead this claim. She specifies that she made several inquiries to specific staff members at Glo Las Vegas about getting information for the owner of the building so that she could raise her concerns about her payment schedule and that they told her that they could not provide that information.[100] She does not, however, explain how she discovered that the landlord listed in her lease was not the actual landlord of the building or how she discovered that Russell Road TIC is the landlord. She also does not specify which licenses TIC Manager lacks, and she offers only the general allegation that "TIC Manager is not licensed to do business in this state."[101] I thus dismiss the portion of Cosey's NDTPA claim about the identity and lack of licensure of the landlord of Glo Las Vegas.

---

[97] *Id*. at 20; Nev. Rev. Stat. § 598.0923(1)(a).

[98] ECF No. 22 at 20.

[99] ECF No. 28 at 6.

[100] ECF No. 22 at 15.

[101] *Id.*

***iv. Cosey has adequately pled an NDTPA claim based on the theory that the defendants charged her attorney's fees without a court order.***

NRS 598.0923(1)(c) states that "[v]iolat[ing] a state or federal statute or regulation relating to the sale or lease of goods or services" is a deceptive trade practice under the NDTPA.[102] Cosey's final theory in her NDTPA claim is that the defendants violated this subsection of the statute by charging her attorney's fees without a court order, which violates NRS 118A.220(2). The defendants seek dismissal of this theory, arguing that these fees were in fact "Lease Violation Notice" fees that were disclosed in her lease, and that they were administrative notice fees and not charges for attorney work.[103]

Cosey has adequately pled this claim. Her complaint includes an image of her payment ledger that shows a $75 charge on November 7, 2023, categorized under "ATTRNY" and "Attorney Or Legal Charges – Cosey."[104] The "who, what, when, where" of this claim is contained within this portion of the payment ledger.

The defendants argue that Cosey's leases contain a provision explaining that there would be a "$75.00 Lease Violation Notice fee per occurrence" and that the leases "characterize late charges as liquidated damages and expressly state [that] they are not for attorney's fees and litigation costs."[105] This is somewhat true. Page five of the lease states under "Other Remedies" that "[l]ate charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs)."[106] Page seven of the

---

[102] Nev. Rev. Stat. § 598.0923(1)(c).

[103] ECF No. 28 at 6–7.

[104] ECF No. 22 at 9.

[105] ECF No. 24 at 11.

[106] ECF No. 24-1 at 6.

lease, however, states that "[i]n the event that the Landlord is required to serve Resident(s) notice of any lease violation notice; Resident shall be liable for payment of $75.00 Notice Fee per occurrence."[107] This portion of the lease does not specify that the violation fee is a liquidated damages provision. The defendants also have not addressed the attorney's fees label in the payment ledger. I thus find that Cosey has pled sufficient facts to support her NDTPA claim based on the theory that the defendants' assessment of attorney's fees against her account without a court order violated NRS 118A.220(2) and thus constitutes a deceptive trade practice under NRS 598.0923(1)(c).

***v. Cosey has sufficiently alleged cognizable damages.***

The defendants next argue that Cosey has not adequately pled damages as required for a private action under NRS 41.600.[108] To plead an NDTPA claim, a plaintiff must plead facts showing that an act of consumer fraud by the defendant caused damages to the plaintiff.[109] Cosey alleges that for each late rent payment, "Greystar charged [her] at least $75 in 'Attorney or Legal Charges'" and that in December of 2024, "Greystar charged [her] $175 in attorney's fees."[110] So I find that Cosey has adequately pled damages resulting from the defendants' act of charging her attorney's fees without a court order, and I deny the defendants' motion in this regard.

---

[107] *Id.* at 8.

[108] ECF No. 24 at 11.

[109] *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009). Because only Cosey's illegal-attorney-fees portion of her NDTPA claim has survived the motion to dismiss, I address defendant's damages argument just as to that theory.

[110] ECF No. 22 at 11.

### *2. Cosey's alleged future harms give her standing to seek injunctive relief.*

In addition to damages, Cosey prays for equitable and injunctive relief.[111] The defendants argue that this remedy request should be dismissed for lack of standing because Cosey hasn't shown a threat of future harm.[112] The "irreducible constitutional minimum" of Article III standing requires that the plaintiff show (i) "an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[113] The plaintiff must satisfy Article III's standing requirements for each claim she "seeks to press and for each form of relief that is sought."[114]

"To seek injunctive relief, a plaintiff must show that [s]he is under threat of suffering 'injury in fact' that is concrete and particularized."[115] Past harm alone is insufficient to meet Article III standing requirements for injunctive relief, though it can be evidence of a threat of future injury.[116] A plaintiff must also establish that any threats of future injury are sufficiently immediate and real.[117] And in consumer-fraud actions, the Ninth Circuit has held that "consumer-fraud plaintiffs can satisfy the imminent-injury requirement by showing [that] they

---

[111] *Id.* at 21–22.

[112] ECF No. 24 at 12.

[113] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); *TransUnion LLC v. Ramirez*, 549 U.S. 413, 423 (2021).

[114] *Maya v. Centex Corp.*, 658 F.3d 1060, 1068–69 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008)).

[115] *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

[116] *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

[117] *Id.* at 497 (quoting *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

'will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [they] would like to.'"[118]

In *Davidson v. Kimberly Clark Corp.*, the Ninth Circuit held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase."[119] In that case, a consumer bought wipes labeled as flushable but later learned that they were not suitable for flushing down toilets. Even though the consumer had not purchased the wipes again,[120] the Ninth Circuit held that her "inability to rely on the validity of the information advertised" by the defendant satisfied the injury requirement for Article III standing.[121]

*Davidson* suggests that Cosey has Article III standing here. Cosey argues that she "continues to be in the market for rental properties in Nevada" and that she is likely to be harmed by Greystar in the future because Greystar is a large apartment manager and manages many rental communities in Nevada.[122] Like the *Davidson* plaintiff who the Ninth Circuit found could not "rely on the validity of the information advertised" by Kimberly Clark, Cosey has sufficiently shown her inability to rely on the prices advertised for renting at other Greystar properties. Denying Cosey the ability to seek injunctive relief would thwart the objective of the

---

[118] *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024) (cleaned up) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 (9th Cir. 2018)).

[119] *Davidson*, 889 F.3d at 969.

[120] *Id.* at 962.

[121] *Id.* at 971.

[122] ECF No. 27 at 12–13.

state consumer-protection laws, so she has standing to seek this form of relief.[123] Thus, to the extent that injunctive relief is appropriate for her remaining claim, I find that Cosey has standing to pursue it.

## Conclusion

IT IS THEREFORE ORDERED that the motion to compel arbitration **[ECF No. 32] is DENIED.** The motion to dismiss **[ECF No. 24] is GRANTED IN PART AND DENIED IN PART**. This case proceeds on the portion of Jaslyn Cosey's NDTPA and consumer-fraud claims grounded in the theory that the defendants violated NRS 598.0923(1)(c) by charging her attorney's fees without a court order, but all other theories are dismissed. If Cosey wants to file an amended complaint in an effort to cure the defects in her other claim theories, she has ten days to file a motion for leave to amend with a proper proposed amended complaint as required by Local Rule 15-1.

U.S. District Judge Jennifer A. Dorsey
September 30, 2026

[123] *See Davidson*, 889 F.3d at 970. The defendants also argue that the proposed class definitions sweep too broadly and encompass injuries that Cosey herself did not suffer or those that are not "plausibly tied to actionable deception." ECF No. 24 at 12. This argument is best addressed at the class-certification-motion stage, should this case ever get there. So I decline to address it now.